## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**ROBERT W. AVERY**                                                    **PLAINTIFF**

**V.**                        **CASE NO. 5:18-CV-05061**

**DEPUTY JOSH HILL; MAJOR**
**RANDALL DENZER; LLOYD**
**MUGGY; and SHERIFF TIM HELDER,**
**Washington County, Arkansas**

**DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

This is a civil rights action filed by Plaintiff Robert Avery pursuant to 42 U.S.C.
§ 1983. Avery proceeds *pro se* and *in forma pauperis*. The claims asserted in this case
arose during Avery's 2016 incarceration in the Washington County Detention Center
("WCDC") from May 24, 2016, until his release to the Arkansas Department of Correction
("ADC") on December 2, 2016.[1] Avery names as Defendants Deputy Josh Hill, Major
Randall Denzer, Lloyd Muggy,[2] and Sheriff Tim Helder. Avery has sued the Defendants
in both their individual and official capacities.[3]

Avery contends his constitutional rights were violated when: (1) he was wrongfully
classified by Defendant Muggy as a violent offender; (2) he was housed in S-block by

---

[1] This is a re-filing of an earlier case, *Avery v. Hill, et al.,* Civil No. 5:17-cv-05213, which
was dismissed without prejudice on March 16, 2018.

[2] Defendant Muggy's rank does not appear in his answer or in the summary judgment
materials.

[3] In his deposition, Avery indicated that he was not suing Major Denzer and Sheriff Helder
in their individual capacities. (Doc. 39-10 at 37 & 42). However, in his summary judgment
response, Avery makes clear that he is asserting individual capacity claims against both
Sheriff Helder and Major Denzer. (Doc. 44).

1

Defendant Muggy in retaliation for acting as a "jail house lawyer" and/or in response for filing lawsuits against personnel of the WCDC; (3) his conditions of confinement were unduly harsh, punitive, and unsafe; (4) Deputy Hill failed to protect him from attack by Stephen Woods ("Woods"); (5) Sheriff Helder and Major Denzer failed to properly train and supervise Deputy Hill; and (6) an unknown deputy acted with deliberate indifference when he seized Avery's medically prescribed TED[4] hose during a search of his cell.

On February 7, 2019, Defendants filed a Motion for Summary Judgment (Doc. 37). The following day, an Order (Doc. 40) was entered directing Avery to file a response to the Motion for Summary Judgment. Avery filed his Response (Doc. 44) on March 22, 2019. The Motion is ready for decision.

## I. BACKGROUND

### A. Avery's Classification and Conditions of Confinement

In the early morning hours of May 24, 2016, Avery was booked into the WCDC on various charges, including aggravated assault and a parole violation. (Doc. 39-2 at 1-2, 5-7).[5] On May 25, 2016, Avery was classified and housed in A-pod S-block. (Doc. 39-6 at 1). Avery believes he should have been placed in B-pod. According to Avery, at his arraignment in June of 2016, no charge of aggravated assault was ever filed, which meant he had no violent charges pending. (Doc. 45 at 1).

On May 29th, May 30th, June 1st, and June 8th, 2016, Avery complained that being locked in a cell with known violent offenders with no intercom or other way to notify jailers of an emergency amounted to a state-created risk of harm as well as a violation of his right to be free from a known risk of harm. (Doc. 39-3 at 2-3). In response, he was

---

[4] TED is an abbreviation for thromboembolic disease.

[5] Citations to the record are to the CM/ECF document and page number.

advised that if he had a problem with the Arkansas Jail Standards that the detention center followed, he could write to the jail standards committee or the Governor. *Id.* at 3.

Avery also contends there were disparate living conditions between A-pod and B-pod. (Doc. 39-10 at 47). According to Avery, A-pod inmates were locked out of their cells all day, were forced to use a single toilet when locked out, had limited movement, had no trustee options, and were not allowed access to televisions or haircuts. (Doc. 39-10 at 47; Doc. 44-8 at 3-4). Avery felt he should be entitled to a haircut at least every couple of months for hygiene reasons. (Doc. 39-10 at 47-48). Avery also complained that thirty-two inmates were required to use the same toilet from 9:00 am to 2:00 pm. (Doc. 44-8 at 4). In contrast, B-pod inmates were in an open barracks setting, had televisions and access to commissary, had trustee options, and were able to obtain haircuts. (Doc. 44-8 at 3; Doc. 44 at 3-4).

In July 2016, Avery was involved in an altercation with another inmate but was not disciplined for it. Avery was treated for a black eye. (Doc. 44-9 at 3).

On August 28, 2016, Avery questioned why he was in S-block despite not having any violent charges pending or filed against him. (Doc. 44-8 at 5). He suggested the system had been manipulated to result in him being housed with violent offenders in retaliation for the filing of civil rights lawsuits. *Id.* On August 30, 2016, Sergeant Morse responded that Avery's classification level was "medium 3" and that he was in the appropriate housing block. (Doc. 44-8 at 5).

On September 26, 2016, inmate Stephen Woods was placed in S-block. According to Avery, Woods was a problem the whole time he was in S-block. (Doc. 39-10 at 32). Avery testified in his deposition that every day that Deputy Hill came into S-block, he was told Woods was a problem and needed to be moved. *Id.*

3

## B. Avery's Account of the Events of October 3, 2016

Avery testified that on October 3, 2016, during pill call, he, Jason Emery, Zachery Cook, and several other inmates asked Deputy Hill to have Woods removed from S-block. (Doc. 39-10 at 22). Avery indicated Woods "was acting crazy, psychotic, calling people out telling them he was going to" physically attack them. *Id.* at 22-23. Inmate James Wheeler stated that Deputy Hill had "knowledge of Woods['] crazy and violent behavior and was asked repeatedly to remove Woods for the good and safety of S/pod." (Doc. 39-5 at 19) (case altered). According to Avery, Woods had a history of being housed separately because of his inability to get along when in general population. *Id.* at 35.

In all, Avery testified that five people told Deputy Hill that Woods was acting crazy and needed to be moved out of S-block. (Doc. 39-10 at 31-32). Avery asserts that he told Deputy Hill that there was an eminent risk of violence that day. *Id.* at 32-33. According to Avery, Woods had told the other inmates that there was going to be a fight. *Id.* at 33.

Avery, Cook, and Emery had pulled Woods aside and told him that he needed to stop jumping off the tables, climbing the rails, and being disruptive. *Id.* at 33. They told Woods that they would "kite" him out of the block if his behavior did not change. *Id.* at 34. As recounted by Avery, at this point, Woods began "throwing a fit" and threatening to attack them. *Id.* Avery testified that when he told Deputy Hill that a fight was "eminent," Deputy Hill responded that he did not have the time to "mess with it" or "deal with it" and shut the door and left. (Doc. 39-10 at 23, 32; Doc. 18 at 1); *see also* Doc. 39-5 at 16.

Avery's version of what occurred next follows: Shortly thereafter, Emery, Cook, and Woods went into Avery's cell—S-14. (Doc. 39-10 at 23). The fight began when Woods threw a punch at Cook. *Id.* at 24. During the ensuing altercation, Woods was hit in the

4

mouth and nose and began spitting saliva and blood at the others stating that he hoped they got Hepatitis C and HIV. [6] *Id.* at 23-24, 26. The other inmates threw Woods off Cook and pushed Woods out of the cell. *Id.* at 23-24. Woods rushed back in and attacked Avery, spitting blood in his face, eyes, and mouth. *Id.* at 24. Avery believed he hit Woods in the mouth.[7] *Id.* at 25. Woods was again thrown out of the cell. *Id.* at 24. Deputy Hill came back into the block and "jumped on the back of Stephen Woods and [Avery]." *Id.* at 23. Avery testified he washed the blood off his face and everything else, trying to make it look like nothing happened so that he would not be sent to the "hole."[8] *Id.*

## C. Deputy Hill's Account of the Events of October 3, 2016

According to Deputy Hill's incident report, at approximately 9:15 a.m.[9] on October 3, 2016, at pill call, he noticed that Emery and Woods seemed to be arguing. (Doc. 39-5 at 14). However, when Emery came to the medication cart, he denied there was any problem. *Id.*; Doc. 44-13 at 1. Deputy Hill maintains he did not talk with Avery about Woods. (Doc. 44-13 at 1). Deputy Hill denies telling anyone to "deal with it." *Id.*

Deputy Hill closed the door to S-block. (Doc. 39-5 at 14). Moments later, he reopened the door because the nurse needed to see two detainees who had failed to come to the cart. *Id.*

_____

[6] Human immunodeficiency virus.

[7] According to Avery, Woods disagreed and denied that Avery had hit him in the mouth. (Doc. 39-10 at 25).

[8] Disciplinary segregation involving twenty-three hour a day lock-down.

[9] Avery disputes that the incident began at 9:15 am. (Doc. 45 at 2). He indicates the nurse on duty listed the time as 9:10 a.m. *Id.* This, of course, is not a material fact.

According to Deputy Hill's incident report, when he re-opened the door to S-block, he saw Avery swing at Woods. (Doc. 39-5 at 14). Deputy Hill called for assistance and ran to cell S-14. *Id*. Woods was running back into S-14. *Id*. Deputy Hill "grabbed Woods and took him out of S14 and forced him to the floor because he was . . . trying to go back into S14." *Id*. Woods continued resisting, yelling, and cursing. *Id*.

Deputy Tanner Weeks assisted Deputy Hill in taking Woods, who was bleeding from his face, into the hallway. Once Woods was secured against the wall, he began dragging his face along the wall, resisting, and thrashing his body around while screaming that he hoped everyone got Hepatitis C. (Doc. 39-5 at 10). The side of Woods' face began bleeding worse. *Id*. at 11. Corporal Roy advised Woods that if he did not stop resisting, he would be tased. (Doc. 39-5 at 9). Woods continued to resist and threatened to fight the deputies. *Id*. During the struggle, Woods' blood came into contact with several of the deputies. *Id*. at 11. In order to secure Woods, he was placed in a restraint chair with a spit mask on. *Id*. at 9. Woods was reassigned to Q-block.

Deputy Joseph Jennings handcuffed and escorted Avery out of the block. (Doc. 39-5 at 13). Deputy Jennings took pictures of Avery and asked if he was hurt. *Id*. When Avery denied he was hurt, Deputy Jennings placed Avery back in S-block. *Id*.

According to Deputy Hill's incident report, when he asked Woods what had caused him to fight, Woods responded that "he was called out and he had to defend himself. Woods stated that he was attacked." (Doc. 39-5 at 14). Deputy Hill reports that Avery admitted that he did hit Woods one time and knocked him to the floor. *Id*. Avery also threw another punch at Woods, but the punch did not connect. *Id*.

6

## D. Disciplinary Charges

All four inmates declined to press charges against one another other. (Doc. 39-5 at 9) Woods, however, was charged with disciplinary violations of battery and failure to obey orders. *Id.* at 24. He was found guilty of both charges. *Id.* Emery was charged with battery and found not guilty. *Id.* at 22. Cook was charged with battery and found guilty. *Id.* at 23.

Avery was also charged with battery. (Doc. 39-5 at 25). Avery pled that he acted in "self-defense." (Doc. 39-3 at 6). He indicated that Woods was in a violent rage and was spitting saliva and blood on him, Emery, and Cook and stating he hoped they contracted Hepatitis C and AIDS[10] as a result. *Id.* Avery explained that he had broken up the fight several times. *Id.* Avery's hands were examined and there was no swelling or cuts suggesting he used his hands in a violent manner. *Id.*

Avery was found not guilty based on video evidence. (Doc. 39-5 at 25). Avery has not tested positive for Hepatitis C or HIV. (Doc. 39-10 at 30). However, he testified that being in contact with Hepatitis C positive blood was a "life-changing event." *Id.* at 31. Avery maintains he suffered mental damages as a result of being spit on in the face and mouth by a Hepatitis C positive inmate. *Id.* at 37. When asked whether he received treatment as a result of the psychological impact of this exposure to Hepatitis C, Avery asserted he believed this incident was connected with him being diagnosed with mental health issues approximately two years after the event.

---

[10] Acquired immunodeficiency syndrome.

## E. Video of the Events of October 3, 2016

Two video files[11] have been submitted to the Court. The first video clip is taken from

the back of the block looking toward the door to the block ("A camera"). The cell doors

are open, and the inmates are in the dayroom lined up to receive their medication. Once

medication distribution is complete, the A camera file shows the following:

14:55 Deputy Hill slides the door shut;[12]
16:07 Deputy Hill slides the door open again;
16:28 Deputy Hill radios for assistance;
16:36 Deputy Hill runs toward the back of the pod; and
16:43 nine other deputies begin arriving.

(Doc. 39-8).

The second video clip is taken from the front of the pod looking back towards the

cells ("B camera"). Cell S-14 is to the far right of the screen. The cell doors are open.

Avery and Emery are wearing red uniforms. (Doc. 39-5 at 22). Cook is in orange pants

and a white t-shirt. *Id.* Woods is in a green stripe uniform. *Id.*

The B camera file shows the following:

45:20 Woods approaches Emery and Cook who turn and enter S-14;
45:30 Woods removes his shirt and enters cell S-14;
45:42 Avery approaches and stands at the entrance to cell S-14;
45:53 Avery is blocking much of the view into the cell; however, it is clear Woods is fighting with another inmate;
45:56 Avery enters the cell and all inmates are out of view of the camera;
46:07 Woods can be seen getting up off the floor twice and continuing to fight;
46:17 Avery walks out of the cell;
46:22 the altercation continues, and Avery returns to the cell door;
46:23 Woods is struck in the head/face area and continues striking someone;

---

[11] There is no audio.

[12] All time references are to the ticker on the lower left of the video. Defendants' references appear to be to the actual time of day. No time of day ticker appears on the video furnished to the court.

8

46:24 Avery strikes Woods on the side of the head; Woods goes to the floor; another inmate[13] appears to be attempting to kick Woods, as he is pushed/dragged out the cell door;

46:32 Woods stands against the wall outside the cell;

46:36 Woods starts back into the cell and Deputy Hill rushes to the cell and grabs him;

46:40 Deputy Hill removes Woods from the cell while Woods resists;

46:41 Deputy Hill takes Woods to the floor;

46:46 by the time other deputies begin arriving, Woods is on the floor and Deputy Hill has Woods handcuffed;

46:48 the other inmates begin to line up against the walls;

47:26 Woods is lifted from the floor and escorted from the block;

47:43 Woods begins to struggle with the officers; and

47:56 Avery is taken from the cell and escorted out of the block in handcuffs.

*Id.*

Switching back to A camera, the following can be seen:

17:46 Woods is led out into the hallway;

17:48 other deputies begin making their way out of the block;

18:06 Avery is led out of the block; and

41:18 Avery is brought back into the block.

*Id.*

## F. Medical Care and Testing

On October 4, 2016, Avery submitted a grievance stating that his TED stockings were taken during a shake down and asking for a replacement. (Doc. 39-3 at 4). Nurse Jessica Yardley responded that she had made the officers aware of the fact that Avery was allowed to have the stockings. *Id.* Avery was told to let the officers know who took the stockings and when. *Id.* Avery could not at the time, and cannot now after discovery, identify the officer involved. (Doc. 39-10 at 52).

On October 12, 2016, Avery asked that his blood be tested since he had come into contact with Woods' saliva and blood. (Doc. 39-3 at 11). A notation was made in his file

---

[13] Defendants identify this inmate as Emery. However, the video is so dim and obstructed that the Court cannot identify the inmate.

that he had been added to "provider review to get lab orders." *Id.* Another notation was then made stating that Hepatitis C and HIV would be checked in three weeks, as it took that long to test positive for the diseases. *Id.* at 12. On October 18, 2019, a note was made in the file that *Woods* had tested negative for HIV but positive for Hepatitis C. (Doc. 39-4 at 2). With respect to Avery, a note was made in his file that labs would be done in three and in six months. *Id.* Avery suffered no symptoms of Hepatitis C or HIV. (Doc. 39-10 at 20).

Avery testified that after he transferred to ADC custody in December of 2016, he was tested for HIV and Hepatitis C. (Doc. 39-10 at 15-16). Avery was not notified of any positive results. *Id.* at 16. Avery was aware there was a gestation or incubation period for both diseases and believed the period was seven years for HIV[14] and the same or shorter for Hepatitis C.[15] *Id.* at 17-19.

Avery had a history of having varicose veins with the condition worsening over the years. (Doc. 39-10 at 50-51). Avery testified he had problems with his legs when he was locked out of his cell on a daily basis because he was limited to walking on the concrete floor or sitting at a steel table. (Doc. 39-10 at 48). Avery was seen by medical staff for his complaints but told that replacement TED hose had been ordered and he could not

---

[14] The window before an individual will test positive for the antibodies for the HIV virus can be up to twelve weeks. https://www.mayoclinic.org/diseases-conditions/hiv-aids/diagnosis-treatment/drc-20373531 (accessed June 26, 2019). The HIV infection may enter a latent stage which "generally lasts around 10 years if [you are] not receiving antiretroviral treatment. But sometimes, even with this treatment, it lasts for decades." https://www.mayoclinic.org/diseases-conditions/hiv-aids/symptoms-causes/syc-20373524 (accessed June 26, 2019).

[15] After exposure, if the person is infected, the Hepatitis C virus antibody blood test will be positive in four to ten weeks. Another blood test, the Hepatitis C virus RNA (virus particles) test can tell if a person is infected within two to three weeks after exposure. https://www.cdc.gov/hepatitis/hcv/cfaq.htm (accessed June 26, 2019).

10

be put on bedrest. *Id.* at 49. Avery was told the medical staff only ordered bedrest when it was something dire, like the loss of a limb. *Id.* Avery maintains he went for fifty-six days without his TED hose. (Doc. 39-10 at 48).

WCDC medical staff scheduled Avery to undergo a venous doppler ultrasound due to concern about the condition of his arteries. (Doc. 39-10 at 49-50). However, Avery was transferred to the ADC prior to the test being performed. *Id.* at 50. While incarcerated at the ADC, Avery was given a four-hour limit for standing, walking, stooping, or crawling. *Id.* He was allowed to go to his bed and prop his leg up, as well. *Id.*

## G. Retaliation

Avery maintains that Sheriff Helder and Major Denzer created a classification policy that led to him being inappropriately classified as a violent offender for seven months even though he had no violent criminal charges. (Doc. 39-10 at 38-39). Avery testified that Defendant Muggy made an assessment based on certain factors and put Avery in a classification resulting in him being housed with violent offenders. *Id.* at 39-40.

Avery believes Defendant Muggy classified him as a violent offender in retaliation for being a "jailhouse lawyer[16]" or "writ writer" and for filing lawsuits against Sheriff Helder and WCDC employees. (Doc. 39-10 at 40-41). Avery had not named Defendant Muggy in his prior lawsuits. *Id.*

While Avery had been told by Defendant Muggy that he was to be reclassified every three months, Avery maintains he was never reclassified. (Doc. 39-10 at 45). Avery also points out that on two subsequent occasions when he returned to the WCDC from the ADC, he was placed in B-pod with non-violent offenders. *Id.* at 39, 43. Avery testified it

---

[16] In particular, Avery maintains he provided assistance to Emery, Jimmy Hancock and Nick Rodriguez. (ECF No. 44 at 5).

was fair to say the fact that he was classified differently both times he returned to the WCDC was the only evidence he had of retaliation. *Id.* at 46.

## H. WCDC Written Policies

The WCDC classification policy provides that "[f]or the preservation of the security and order of the detention facility, its staff and detainees, every detainee will be classified upon admission to the facility and shall be assigned housing according to the classification. There shall be no discrimination by race, creed, national origin or sexual preference." (Doc. 39-7 at 3). The classification system takes into consideration: (1) a detainee's criminal history (prior convictions) and pending charges; (2) available space; and (3) any persons who are known as a threat to the detainee or who have been threatened by the detainee. (Doc. 39-1 at 2). According to Corporal Mulvaney, it is possible that a detainee be classified and housed differently during a particular stay or subsequent stay depending on the resolution of charges pending or any additional information as to threats related to that detainee. *Id.* at 3.

In general, A-pod is for segregated detainees (administrative and disciplinary) and for high or medium-high risk inmates. (Doc. 39-1 at 3). B-pod is used to house low to low-medium risk inmates and trustees. *Id.*

The WCDC has a procedure for assignment of inmates to administrative segregation. (Doc. 39-1 at 3). The decision is made by the facility supervisor on the basis of the following: a written, signed, and dated request for segregation made by the detainee; observations or reports from officers of persistently disruptive or potentially disruptive behavior, or abnormal behavior that requires removal of the detainee from the general population; a report from the facility physician or nurse; an apparent need for protection; or a recommendation of a judge, prosecutor, or the arresting agency. *Id.*

12

When an inmate identifies a specific threat to his safety or security in his pod, the inmate will be rehoused to ensure his safety. (Doc. 39-1 at 3). However, due to the limited amount of housing options available on quick notice, such a request often results in an inmate being placed in administrative segregation/protective custody until a safe housing location can be found. *Id.* To assure that inmates are not moved into a dangerous situation and to guard against false claims of threats, officers must determine who poses the alleged threat claimed by an inmate before the inmate can be moved. *Id.* at 3-4. Vague or nonspecific threats do not generally lead to rehousing. *Id.* at 4.

The WCDC has precautions in place to identify and prevent the spread of contagious disease. (Doc. 39-1 at 4). Reasonably prompt confidential testing services are available to detainees who voluntarily request testing or are ordered to undergo involuntary testing. *Id.*

## II. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts.' *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165

13

F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## III. DISCUSSION

Defendants contend they are entitled to summary judgment in their favor because: (1) there is no proof of any personal involvement by Sheriff Helder or Major Denzer; (2) Avery's housing classification did not violate his constitutional rights; (3) there was no retaliatory conduct in connection with Avery's housing classification; (4) Deputy Hill did not fail to protect Avery; (5) Defendants are entitled to qualified immunity; and (6) there is no basis for official capacity liability.

Section 1983 provides that "[e]very person who, under color of any statute [or] regulation . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. Thus, to establish a claim under § 1983, Avery must prove that the Defendants were acting under color of law in depriving him of a right secured by the Constitution or laws of the United States. The first question the Court must ask is whether Avery was a pretrial detainee or a convicted prisoner. Different constitutional standards may apply depending on Avery's status. Pretrial detainees are entitled to greater protection compared to convicted inmates because "'[d]ue process requires that a pretrial detainee not be punished.'" *Walton v. Dawson*, 752 F.3d 1109, 1117 (8th Cir. 2014) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1976)).

Here, Avery was being held on pending criminal charges including a parole violation charge. (Doc. 39-2 at 8). There is a handwritten notation on one record that

14

Avery pleaded guilty. *Id.* However, the date of conviction is not written on this document. *Id.* Avery was transferred to the ADC on December 2, 2016. *Id.* at 9. Defendants have indicated in their brief that Avery was a pretrial detainee on October 3, 2016. (Doc. 38 at 13). The Court will therefore apply the standards applicable to pretrial detainees.

## A. Classification

### 1. Due Process

Inmates have no constitutional right to a particular prison classification or housing assignment. *Nash v. Black*, 781 F.2d 665, 668 (8th Cir. 1986). "Due process is not an end in itself. 'Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement.'" *Id.* (quoting *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983)). Avery "must first identify some liberty interest, created by state law, regulation, or practice, to which he has a legitimate claim of entitlement." *Id.* (citing *Jones v. Mabry*, 723 F.2d 590, 593 (8th Cir. 1993)).

Avery contends he was entitled to be classified as a non-violent offender and separated from violent offenders under the WCDC's classification and housing policies. The classification policy allowed Defendant Muggy, or another classification officer,[17] to consider a number of factors in classifying incoming detainees such as Avery; one factor was pending charges. The classification and housing policies do not preclude consideration of other factors and do not create a liberty interest. *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 463 (1989) (liberty interest created if state law contains

---

[17] According to Avery, Defendant Muggy was the classification officer. (Doc. 39-10 at 39-40). The inmate tracking record lists the classification officer as DC01. (Doc. 44-6 at 4). The Court has not been provided with any evidence indicating whether or not Defendant Muggy is DC01.

substantive predicates to the exercise of discretion and specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow). Discretionary decisions do not create a liberty interest. *See, e.g., Persechini v. Callaway*, 651 F.3d 802, 807-08 (8th Cir. 2011) (no liberty interest in discretionary parole decision); *Madewell v. Roberts,* 909 F.2d 1203, 1207 (8th Cir. 1990) (Board of Corrections given broad discretion in classifying inmates, and inmates have no protected liberty interest in their classification).

Avery contends his classification was in error and he should not have been housed with the violent inmates. He concedes, however, that one of his pending charges was aggravated assault—a violent crime. While he argues this charge was later dropped, this fact was not known at the time the original classification decision was made.

Even if the original classification was correct, Avery argues that his classification should have been changed at the three-month review. He contends that by then, the aggravated assault charge had been dropped. However, at that point, the evidence shows that Avery had been involved in an altercation with another inmate. During the next three-month period, Avery was involved in the October 3, 2016, altercation. Negligence or the violation of the classification policy in making the original classification, or in the quarterly review of Avery's classification, does not state a constitutional claim. *Walton v. Dawson*, 752 F.3d 1109, 1122 (8th Cir. 2014) ("[V]iolating an internal policy does not *ipso facto* violate the Constitution . . . ."). Avery has shown no liberty interest in being classified as a non-violent detainee.

Accordingly, Avery's individual capacity Due Process claim fails. Further, Defendant Muggy would be entitled to the protection afforded him by qualified immunity

on this claim. "Qualified immunity protects public officials from damage actions if their conduct did not violate clearly established rights of which a reasonable person would have known." *Morris v. Lanpher*, 563 F.3d 399, 402 (8th Cir. 2009) (citations omitted). "Qualified immunity requires a two-part inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Akins v. Epperly*, 588 F.3d 1178, 1183 (8th Cir. 2009) (citation omitted). The court may address these elements in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "Unless the answer to both questions is yes, the defendant[] [is] entitled to qualified immunity." *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009).

Here, having found that the facts do not make out a constitutional violation, the answer to the first of the two qualified immunity inquiries is "no." Therefore, Defendant Muggy is entitled to qualified immunity. *Id.* (unless the facts make out a violation of a constitutional right, the Defendant is entitled to qualified immunity).

As to Avery's official capacity claim, it is equivalent to a claim against Washington County. *Murray v. Lene*, 595 F.3d 868, 873 (8th Cir. 2010). Washington County can be held liable only if its policy or custom was the moving force behind the constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Wall v. Stanek*, 794 F.3d 890, 893 (8th Cir. 2015).

The WCDC's classification policy is designed to separate violent and non-violent inmates. "A policy which does not 'affirmatively sanction' unconstitutional action, and which instead relies on the discretion of the municipality's employees, is not an

17

unconstitutional policy." Moyle v. Anderson, 571 F.3d 814, 818 (8th Cir. 2009) (citations

omitted).

Because the WCDC's policy was:

facially lawful and did not compel unconstitutional action, [Avery has] the high burden of proving that the county's decision to maintain the policy was made with deliberate indifference to its known or obvious consequences. The standard for deliberate indifference is objective; a governmental entity is liable if it has maintained a policy in which the inadequacy is so obvious, and the inadequacy is so likely to result in the violation of constitutional rights that the policymakers can be said to have been deliberately indifferent. A showing of simple or even heightened negligence will not suffice.

Id. at 818-819 (internal quotation marks and citations omitted).

Here, Avery has pointed to no evidence in the summary judgment record that

creates a genuine issue of material fact as to whether "the county had notice of an alleged

inadequacy in the booking [classification] polic[ies] or that the polic[ies'] alleged

inadequac[ies were] so patently obvious that the county should have known that a

constitutional violation was inevitable." Moyle, 571 F.3d at 819. Avery's official capacity

Due Process claim therefore fails.

In sum, Defendants are entitled to summary judgment on both the individual

capacity and the official capacity Due Process claims.

## 2. Retaliation

Avery maintains that Defendant Muggy retaliated against him for filing civil rights

lawsuits and for acting as a "jailhouse lawyer." To prevail on his retaliation claim, Avery

must show: "(1) that he engaged in protected activity; (2) that the defendant took adverse

action against him that would chill a person of ordinary firmness from continuing in the

activity; and (3) that the adverse action was motivated in part by [Avery's] exercise of his

18

constitutional rights." *Eggenberger v. West Albany Twp.,* 820 F.3d 938, 943 (8th Cir. 2016) (citation omitted). The test is an objective one: "the question is not whether the plaintiff himself was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done." *Id.*

Generally, "[c]onduct that retaliates against the exercise of a constitutionally protected right is actionable, even if the conduct would have been proper if motivated by a different reason." *Cody v. Weber,* 256 F.3d 764, 771 (8th Cir. 2001) (citing *Madewell,* 909 F.2d at 1206). The retaliatory conduct itself need not be a constitutional violation to be actionable. Additionally, there is no independent injury requirement when retaliatory conduct is involved. *See Dixon v. Brown,* 38 F.3d 379, 380 (8th Cir. 1994).

Avery filed only one lawsuit involving WCDC employees prior to May 24, 2016-- *Avery v. Denzer, et al.,* Civil No. 5:13-cv-05001, filed on January 3, 2013. Defendant Muggy was not a named Defendant in that lawsuit. There is no question that Avery engaged in protected First Amendment activity in filing the lawsuit. *See Lewis v. Jacks,* 486 F.3d 1025 (8th Cir. 2007). Avery also had a long history of filing civil rights actions involving counties located in Northwest Arkansas.[18]

Avery also had a reputation for assisting other inmates in filing civil rights lawsuits. However, Avery had no constitutional right to provide legal assistance to other inmates. *Bear v. Kautzky,* 305 F.3d 802, 806 (8th Cir. 2002) (citing *Shaw v. Murphy,* 532 U.S. 223, 232 (2001)); *Williams v. Nix,* 1 F.3d 712, 716 (8th Cir. 1993) ("Performing lawyering

---

[18] *Avery v. Ferguson, et al.,* Civil No. 5:04-cv-05116 (filed May 24, 2004); *Avery v. Ferguson, et al.,* Civil No. 5:04-cv-05205 (filed August 12, 2004); *Avery v. Ferguson, et al.,* Civil No. 5:07-cv-05111 (filed June 22, 2007); *Avery v. Benton County Detention Center, et al.,* Civil No. 5:14-cv-05008 (filed January 9, 2014); *Avery v. Ferguson, et al.,* Civil No. 5:08-cv-05091 (filed April 23, 2008); *Avery v. Boyd, et al.,* Civil No. 5:14-cv-05059 (filed February 13, 2014).

functions on behalf of fellow inmates is a privilege, not a right . . . an individual inmate does not have a constitutional right to 'practice' jailhouse law.").

The alleged retaliatory actions at issue here are: Defendant Muggy's classification of Avery as a violent offender resulting in him being housed in A-pod S-block; and Defendant Muggy's failure to reclassify Avery after three-months. Avery's belief that these actions were retaliatory was primarily based on the fact that the next two times he was housed in the WCDC, he was classified as a non-violent offender and housed in B-pod.

A-pod inmates have fewer privileges and are locked out of their cells for large portions of the day. "Adverse actions which may show retaliation include denial of privileges or acts worsening an inmate's working conditions." *Spencer v. Jackson Ctny., Mo.,* 738 F.3d 907, 911 (8th Cir. 2013) (citations omitted). The classification of Avery as a violent inmate resulting in him being housed under harsher conditions could potentially constitute an adverse action. However, to be actionable, the adverse action must be such that it would chill a person of ordinary firmness from continuing in the protected activity. *Eggenberger,* 820 F.3d at 943. It is evident that Avery's assignment to A-pod S-block did not chill Avery from exercising his First Amendment rights. He filed two lawsuits while he was incarcerated at the WDCD in A-pod S-block, during the same period of time relevant to his Complaint.[19] Nevertheless, for purposes of this motion for summary judgment, the Court will assume that Avery's classification as a violent offender and assignment to A-pod constitutes an adverse action that would chill a person of ordinary firmness from continuing in the protected activity.

---

[19] *Avery v. Helder, et al.,* Civil No. 5:16-cv-05169 (filed July 6, 2016) and *Avery v. Hyslip, et al.,* Civil No. 5:16-cv-05283 (filed October 10, 2016).

"In addition to the other elements of retaliation, [Avery] must prove that he would not have been [classified as a violent offender] but for an unconstitutional, retaliatory motive." *Spencer*, 738 F.3d at 912 (internal quotation marks and citation omitted). The key question is whether Defendant Muggy's classification decision was motivated "at least in part" by Avery's litigious history. *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004).

The summary judgment record contains nothing to suggest Defendant Muggy did anything other than properly apply the classification policy to Avery when he was booked into the WCDC. Avery did, at the time of his booking, have an aggravated assault charge pending. Similarly, as discussed in more detail above, after three months of incarceration at the WCDC, Avery had already been involved in an altercation with another inmate; and at the six-month point, Avery had been already been involved in the altercation with Woods.

Although Avery was sent to the WCDC on two subsequent occasions and was classified as a non-violent offender both times, this fact does not demonstrate Avery was retaliated against. As noted by Corporal Mulvaney, "[i]t is possible for a detainee to be classified and housed differently during a particular stay or on a subsequent stay depending on the resolution of charges pending or any additional information as to threats related to that detainee." (Doc. 39-1 at 3). The fact that Avery was classified differently on subsequent occasions does not establish a retaliatory motive on Defendant Muggy's part. There has been no factual showing that Defendant Muggy "was aware of, or was affected by, the prisoner's earlier constitutionally protected activity from which retaliatory animus could be inferred." *Cabrera-Ascencio v. Young*, 2018 WL 5314937, at *3-4 (D.S.D. Oct. 26, 2018) (internal quotation marks and citation omitted). In short, there are no genuine issues of material fact as to whether Defendant Muggy classified Avery as a

21

violent offender in retaliation for Avery filing civil rights actions against the WCDC or other detention facilities in Northwest Arkansas. See Spencer, 738 F.3d at 912 (plaintiff must show that the adverse action would not have occurred "but for an unconstitutional, retaliatory motive"); Baribeau v. City of Minneapolis, 596 F.3d 465, 481 (8th Cir. 2010) (under the third prong plaintiff must show retaliatory motive was a "substantial factor" or "but-for cause" of the adverse action).

Next, Defendant Muggy maintains he is entitled to qualified immunity. He is correct. Having found that the facts do not make out a constitutional violation, Defendant Muggy is entitled to qualified immunity. See, e.g., Krout, 583 F.3d at 564 (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

As to Avery's official capacity retaliation claim, Avery has pointed to no custom or policy that was the moving force behind Defendant Muggy's alleged acts of retaliation. Jenkins v. Cnty. of Hennepin, Minn., 557 F.3d 628, 633 (8th Cir. 2009) (plaintiff must show the policy is the moving force behind the harm suffered). The Defendants are entitled to summary judgment on the official capacity retaliation claim.

In sum, Defendants are entitled to summary judgment on both the individual and official capacity retaliation claims.

## 3. Equal Protection

Next, Avery asserts an Equal Protection claim based on the fact that he was classified and housed with violent offenders in A-pod and denied the same rights as similarly situated non-violent offenders in B-pod. "The Equal Protection Clause requires that government entities treat similarly situated persons alike." Hager v. Ark. Dep't of Health, 735 F.3d 1009, 1014 (8th Cir. 2013) (citations omitted). To prevail, Avery must

22

demonstrate that: (1) he was similarly situated with the offenders classified as non-violent and housed in B-pod; (2) he was treated differently based on an unjustifiable standard such as race, religion, the exercise of constitutional rights, or other arbitrary classification; and (3) Defendants acted with discriminatory intent. United States v. Leathers, 354 F.3d 955, 962 (8th Cir. 2004); Greer v. Amesqua, 212 F.3d 358, 370 (8th Cir. 2000). "When no fundamental right or suspect class is at issue, a challenged [action] must pass the rational basis test." Hughes v. City of Cedar Rapids, Iowa, 840 F.3d 987, 996 (8th Cir. 2016) (citation omitted).

Avery essentially presents his same misclassification arguments, but he phrases them in terms of a violation of the Equal Protection Clause. He identifies no similarly situated offender in B-pod. In other words, he has failed to identify even one offender housed in B-pod who had a violent charge at the time of classification. Without establishing there were similarly situated inmates in B-pod, Avery's claim fails on this element. Defendants are entitled to summary judgment on the individual capacity Equal Protection claims.

Avery's official capacity Equal Protection claim also fails, as he has pointed to no custom or policy that was the moving force behind an alleged Equal Protection violation. Jenkins, 557 F.3d at 633 (plaintiff must show the policy is the moving force behind the harm suffered).

In sum, Defendants are entitled to summary judgment on both the individual and official capacity Equal Protection claims.

23

## B. Conditions of Confinement

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998) (citation omitted). The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "The Eighth Amendment prohibits punishments that deprive inmates of the minimal civilized measure of life's necessities." *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996).[20] Jail or prison officials must provide reasonably adequate food, clothing, shelter, medical care, warmth, safety, sanitary living conditions and exercise. *Wilson v. Seiter*, 501 U.S. 294, 304 (1994). Claims for unlawful conditions of confinement include threats to an inmate's health and safety. *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008) (citation omitted).

A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. *See Revels*, 382 F.3d at 875 (citing *Wilson*, 501 U.S. at 298). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities. The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner." *Id.* (citations and internal quotation marks omitted). Deliberate indifference is established when the plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health

---

[20] *Hall v. Dalton*, 34 F.3d 648, 650 (8th Cir. 1994) (Eighth Circuit applies same standard to both pretrial detainees and convicted inmates).

or safety." Id. However, courts are not concerned with de minimis levels of imposition on inmates. See Bell v. Wolfish, 441 U.S. 520, 535 (1979).

Avery complains of the following conditions: no intercoms in the cells; when locked out of the cell his choice was to walk around on concrete or sit on a steel stool, both of which caused swelling and pain in his legs; jail rounds are only made hourly; he was housed with inmates having Hepatitis C and HIV; he was housed with violent inmates; he was housed with Woods, who had "mental problems"; during lock-out periods, all inmates had to share one toilet; he was denied access to television, which he considers to be the only meaningful access to news media; and he was denied the same conditions as inmates housed in B-pod, for example, unlimited access to his bedding, commissary, hygiene items, or haircuts; and he was not housed in open barracks.

Avery has not identified any incidents where the lack of intercoms and the infrequency of jail rounds impacted him. With respect to the altercation with Woods, Avery testified that Deputy Hill responded almost immediately, and other deputies responded quickly to Deputy Hill's call for assistance. Avery does not deny the WCDC was following the security requirements of the Arkansas Jail Standards. Certainly, the summary judgment record contains nothing to suggest the Defendants evidenced a culpable state of mind.

As to being housed with inmates with Hepatitis C or HIV, these diseases are spread when blood or other bodily fluids from an infected individual enters the body of someone who is not infected.[21] They are not airborne pathogens. It is undisputed that

---

[21] https://www.cdc.gov/hepatitis/hcv/cfaq.htm#C1 (accessed July 1, 2019);

25

were not required to share one toilet during time spent outside the cell, and were not forced to spend the day walking on a concrete floor or sitting on a steel stool. While Avery may have preferred being housed in B-pod, there is a fundamental difference between depriving an inmate of more comfortable living conditions and depriving an inmate of the basic necessities of life with which the Eighth Amendment is concerned. "[E]xtreme deprivations are required to make out a conditions-of confinement claim. [O]nly those deprivations denying the minimal of civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Hudson v. McMillian, 503 U.S. 1, 9 (1992). The conditions identified by Avery, while more restrictive or harsh than those present in B-pod, clearly do not violate the Eighth Amendment, which is concerned with the basic concepts of humanity and decency.

Defendants are entitled to summary judgment on the individual capacity Equal Protection claims. Likewise, the Defendants are entitled to summary judgment on the official capacity Equal Protection claim, as Avery has pointed to no custom or policy that resulted in his being subjected to unconstitutional conditions of confinement.

## C. Failure to Protect

Prison officials have a duty, under the Eighth Amendment, to protect prisoners from violence at the hands of other prisoners. [22] See Perkins v. Grimes, 161 F.3d 1127, 1129 (8th Cir. 1998). However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." Farmer, 511 U.S. at 834. "Claims under the Eighth Amendment require

---

[22] The Eighth Circuit applies the same standard to pretrial detainees as it does to convicted inmates. Crow v. Montgomery, 403 F.3d 598, 601-02 (8th Cir. 2005).

as of 2018, Avery had not been diagnosed as having either disease. Other than during the altercation with Woods, Avery does not contend he was in a position where he was exposed to the blood or bodily fluids of an inmate with these diseases. The possibility of transmission of these diseases through casual contact is too remote to provide a proper basis for relief. *Glick v. Henderson*, 855 F.2d 536, 530 (8th Cir. 1988); *see also Robbins v. Clarke*, 946 F.2d 1331, 1333 (8th Cir. 1991) ("[T]he failure to segregate HIV-positive prisoners from the general population does not constitute cruel and unusual punishment of the uninfected prisoners."). There has been no showing that there was a substantial risk of the diseases spreading or that, subjectively, the Defendants actually knew of but deliberately disregarded a substantial risk of harm. Mere negligence is insufficient to support a conditions of confinement claim. *See Lambert v. City of Dumas*, 187 F.3d 931, 936 (8th Cir. 1999).

Avery has not attempted to explain the nature of Woods' mental illness or how Woods' condition put Avery at risk. Indeed, Avery merely asserts that Woods repeatedly acted out and did not respond well when Avery and others suggested he cease this conduct. For purposes of this summary judgment motion, the Court will assume that Woods had one or more identifiable mental illnesses. However, being housed with a mentally ill inmate does not, in and of itself, pose an excessive safety risk.

Avery also contends he should not have been housed with violent inmates such as Woods. He contends he should have been classified as a non-violent offender and placed in B-pod, where the inmates had access to their beds, television, and commissary,

---

https://aidsinfo.nih.gov/understanding-hiv-aids/fact-sheets/20/48/the-basics-of-hiv-prevention (accessed July 1, 2019).

a compensable injury to be greater than *de minimis.*" *Irving v. Dormire,* 519 F.3d 441, 448 (8th Cir. 2008).

To prevail on his failure-to-protect claim, Avery must satisfy a two-pronged test. He must demonstrate that: (1) he was "incarcerated under conditions posing a substantial risk of serious harm"; and (2) prison officials were "deliberately indifferent [to his] health or safety." *See Holden v. Hirner,* 663 F.3d 336, 341 (8th Cir. 2011) (internal citations omitted). The first prong is an objective requirement to ensure the deprivation of a constitutional right is sufficiently serious. *Nelson v. Shuffman,* 603 F.3d 439, 446 (8th Cir. 2010). "The deprivation is objectively, sufficiently serious, under the first requirement when the official's failure to protect resulted in the inmate being incarcerated under conditions posing a substantial risk of serious harm." *Id.* (internal punctuation marks and citations omitted).

The second prong, however, is subjective and requires that Plaintiff show that the official in question "both knew of and disregarded 'an excessive risk to inmate's health or safety.'" *Holden,* 663 F.3d at 341 (quoting *Farmer,* 511 U.S. at 837). "An official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond reasonably to it." *Young v. Selk,* 508 F.3d 868, 873 (8th Cir. 2007). Negligence alone is insufficient to meet the second prong; instead, the official must "recklessly disregard a known, excessive risk of serious harm to the inmate." *Davis v. Oregon Cnty.,* 607 F.3d 543, 549 (8th Cir. 2010) (internal quotation marks and citation omitted). Plaintiff "need not show 'that a prison official acted or failed to act believing that harm actually would befall an inmate, it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.'" *Nelson,* 603 F.3d at 447 (quoting

*Farmer*, 511 U.S. at 842). "Moreover, 'in order to have a viable deliberate indifference claim, a plaintiff is *not* required to allege and prove that the defendant . . . specifically knew about or anticipated the precise source of the harm.'" *Id.* (quoting *Kahle v. Leonard*, 477 F.3d 544, 551 (8th Cir. 2007)).

### 1. Individual Capacity Failure-to-Protect Claim Against Deputy Hill

It is recognized that "threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998). In this case, prior to the assault on October 3, 2016, there had been no previous incidents or disputes between Avery and Woods. There is no evidence in the record suggesting that Woods had been involved in other altercations or was the aggressor in any prior assaults in S-block or in other blocks. Even if such a history existed, "[a]n inmate's history of violence alone in insufficient to impute to prison official's subjective knowledge of the inmate's danger of harm to other inmates." *Holden*, 663 F.3d at 341 (citation omitted).

Avery contends Deputy Hill failed to remove Woods on October 3, 2016, even though he witnessed Woods' disturbing behavior and was told by multiple inmates of their fears for their safety if Woods was not removed from S-block. (Doc. 44-11 at 8). Avery contends that he and Emery made it clear during pill call that "Woods was acting crazy and needed to be moved out of s/pod." *Id.* at 10. Emery states security had been made aware of the issues with Woods' behavior "many times" and "Hill was made aware the morning of [the] incident that there was an issue." *Id.* at 8. Cook notes that Woods was mentally disturbed and that everyone knew it. *Id.* at 9. Cook also backs up Emery's statement that he told Deputy Hill there was an issue and Woods needed to be taken out

29

of S-block. *Id.* Cook also states that Deputy Hill told the inmates to "handle it." *Id.* Detainee Hancock indicates that Woods "was a mess [I'm] sure the guards knew that, from the things he did, and was told about daily." *Id.* at 10. Detainee Farmer states that Deputy Hill "was aware of Woods['] violent and crazy behavior at pill call and was asked to remove Woods from s/pod for the good and safety of everyone." *Id.* at 11. Detainee Wheeler indicates that Deputy Hill was asked at pill call to remove Woods and "had knowledge of Woods['] crazy and [violent] behavior and was asked repeatedly to remove Woods for the good and safety of s/pod." *Id.* Detainees Martinez, Stegall, and Gregg make similar statements about Woods' conduct and Hill's knowledge about the same. *Id.* at 12-13.

Deputy Hill denies having talked to Avery; Deputy Hill maintains that Emery told him there was no problem with Woods; and Deputy Hill denies having prior knowledge that Woods posed a substantial risk of serious harm to Avery or any other inmates in S-block. (Doc. 44-11 at 6).

Clearly, Avery and the other detainees' statements are in direct contradiction to those of Deputy Hill. (Doc. 44-11 at 8-13). The video of the incident that was submitted with the summary judgment record has no audio and therefore provides no independent source of information as to what statements were made to Deputy Hill and how he responded to those statements.

What is key, however, is that Avery admits he suffered no actual physical injury as a result of the altercation with Woods. He maintains he did live in fear for months that he would contract Hepatitis C or HIV. But "[b]ecause a § 1983 action is a type of tort claim, general principles of tort law require that a plaintiff suffer actual injury before he can

30

receive compensation . . . . Claims under the Eighth Amendment require a compensable injury to be greater than *de minimis*." *Irving*, 519 F.3d at 448. An allegation that an inmate was spit upon has typically been held to qualify as only a *de minimis* injury, one that is not sufficiently serious to constitute a constitutional violation. *See Jones v. Nassau Cnty. Corr. Inst.*, 2014 WL 1277908 (E.D.N.Y. March 26, 2014) (plaintiff had not alleged a sufficiently serious injury with regard to his allegation that an inmate spit on him); *Neason v. Bienko*, 2012 WL 4760891 (W.D.N.Y. Oct. 5, 2012) (dismissing failure-to-protect claim and finding that the allegation that another inmate spit on the plaintiff did not allege a *de minimis* injury). Avery's failure-to-protect claim fails, as he has not alleged that he suffered an objectively serious injury arising from the alleged failure to protect.

Accordingly, Deputy Hill is entitled to summary judgment on the individual capacity failure-to-protect claim against him.

## 2. Qualified Immunity

Having found that the facts do not make out a constitutional violation, Deputy Hill is entitled to qualified immunity. *See, e.g., Krout*, 583 F.3d at 564 (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

## 3. Individual Capacity Failure-to-Protect Claim against the Remaining Defendants

A claim of deprivation of a constitutional right cannot be based on a *respondeat superior* theory of liability. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 654, 694 (1978). "[A] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity." *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994); *see also Whitson v. Stone Cnty. Jail*, 602 F.3d 920, 928 (8th Cir. 2010) ("In a § 1983 case, an official is only liable for his own misconduct and is not accountable for the misdeeds of

his agents under a theory such as respondeat superior or supervisor liability") (internal quotations omitted).

"Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability of the supervisory defendant, [Plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (quoting *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006)). Avery has presented no evidence that Sheriff Helder or Major Denzer were personally involved, or even aware, of Woods' erratic and/or aggressive behavior or the situation in S-block. Accordingly, there is no basis on which to hold Sheriff Helder or Major Denzer liable in their individual capacities.

## 4. Official Capacity Failure-to-Protect Claim

Avery does not allege the existence of a custom or policy that was the moving factor behind the alleged failure to protect. While he makes conclusory allegations regarding a failure-to-supervise and/or -train claim, he provides no factual support for these claims. *See Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010) (setting forth the requirements to establish governmental or official capacity liability based on a failure to train or supervise).

The Defendants are entitled to summary judgment on the official capacity failure-to-protect claim.

## D. Denial of Medical Care

The deputy who seized the TED hose has not been identified. Avery did not name any medical personnel as Defendants in connection with his claim that he was denied

bed rest. Avery has not alleged that any custom or policy existed that resulted in him being deprived of his TED hose or bed rest.

The time to add parties and the time to identify John Doe Defendants has expired. (Doc. 20 at 2-3). Discovery is complete in this matter. *Id.* at 2. Accordingly, this claim will be dismissed.

## IV.   CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment (Doc. 37) is **GRANTED**, and this case is **DISMISSED WITH PREJUDICE.** A separate judgment will be entered.

**IT IS SO ORDERED** on this 27th day of August, 2019.

TIMOTHY L BROOKS
UNITED STATES DISTRICT JUDGE

33